IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| LEGALZOOM.COM, INC., | |
| Plaintiff, | |
| v. | |
| NORTH CAROLINA STATE BAR; RONALD L. GIBSON, in his official capacity only; JOSHUA T. WALTHALL, in his official and individual capacities; FERN GUNN SIMEON, in her official and individual capacities; and JOHN N. FOUNTAIN, in his official and individual capacities, | CASE NO. 1:15-CV-439 |
| Defendants. | |

**BRIEF IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS**

# INDEX

**Page**

INTRODUCTION ........................................................................1

STATEMENT OF THE CASE.........................................................3

STATEMENT OF FACTS ..............................................................4

    A.   The State Bar and Chief Justice's Rulemaking
          Process...............................................................6

    B.   LegalZoom's Attempts to Register its Purported
          Prepaid Plans.......................................................7

        1.   First registration attempt in 2010.................................7

        2.   Subsequent registration attempt in 2014 ......................8

QUESTIONS PRESENTED..............................................................9

ARGUMENT .............................................................................. 10

    I.    LEGALZOOM HAS NOT ADEQUATELY
        ALLEGED ANTITRUST INJURY NOR
        MONOPOLISTIC BEHAVIOR BY
        COMPETITORS SUCH THAT ITS
        SHERMAN ACT CLAIMS FAIL ................................... 11

        A.   LegalZoom Has Failed to Plead (and Has
            Not Suffered) an Antitrust Injury .............................. 12

        B.   LegalZoom Failed to Adequately Plead a
            Conspiracy by Competitors to Exclude it
            from the Market ...................................................... 16

    II.   LEGALZOOM'S CLAIMS ARE BARRED BY
        THE SHERMAN ACT'S STATUTE OF
        LIMITATIONS ................................................... 19

    III.  AS A STATE ACTOR, THE STATE BAR IS
        IMMUNE FROM ANTITRUST ACTION ...................... 22

        A.   The State Bar is a State Actor and Immune
            from Antitrust Actions.............................................. 23

        B.   The State Bar is a Quintessential State
            Agency so Plaintiff's Claims Fail.............................. 26

    C.   At a Minimum, the State Bar is Immune under the *Parker* Doctrine ........................................ 28

        1.   The State Bar, with the supervision of the Chief Justice, meets the *Parker* test.............. 29

        2.   The Attorney General's participation is an additional indicia of active supervision ...................................................... 34

IV.   THE ELEVENTH AMENDMENT BARS CLAIMS FOR MONEY DAMAGES .............................. 35

    A.   The State Bar Has Eleventh Amendment Immunity.................................................................... 36

    B.   The Individual Defendants Sued in Their Official Capacities Have Eleventh Amendment Immunity............................................... 39

    C.   The Individual Defendants Sued in Their Individual Capacities Have Eleventh Amendment Immunity............................................... 40

V.   THE INDIVIDUAL DEFENDANTS HAVE QUALIFIED IMMUNITY FROM PLAINTIFF'S CLAIMS .................................................... 41

VI.   DEFENDANT FOUNTAIN HAS ABSOLUTE QUASI-JUDICIAL IMMUNITY FROM PLAINTIFF'S CLAIMS .................................................... 44

VII.   DEFENDANTS WALTHALL AND SIMEON HAVE ABSOLUTE QUASI-PROSECUTORIAL IMMUNITY FROM PLAINTIFF'S CLAIMS .................................................... 47

    A.   Defendant Walthall Has Quasi-Prosecutorial Immunity in Connection With the 2014 Registration Attempt.......................... 48

    B.   Claims Against Defendant Simeon in Connection With the 2010 Registration Attempt Should Also be Dismissed........................... 49

CONCLUSION............................................................................. 50

CERTIFICATE OF SERVICE ...................................................... 52

# INTRODUCTION

The North Carolina State Bar is the state agency charged by statute and by regulation approved by the Chief Justice of the North Carolina Supreme Court with the power to register prepaid legal services plans in North Carolina. Pursuant to that authority, the State Bar declined to register two of LegalZoom's purported prepaid plans that did not comply with the regulations that govern such plans. LegalZoom now claims that the State Bar's exercise of its regulatory authority is an antitrust violation. This is despite the fact that LegalZoom does not and cannot allege either anticompetitive conduct or antitrust injury, the ills that the Sherman Act is designed to address.

This is not a case about whether prepaid plans can operate in North Carolina – they can and they do. The State Bar "readily register[s]" prepaid plans. (Compl. ¶ 66.) As LegalZoom admitted in its Complaint, numerous plans are currently registered.

This is not a case about one competitor seeking to exclude another from the marketplace. The lawyer-employees of the State Bar and the lawyer-members of its Authorized Practice Committee ("APC") who voted not to register LegalZoom's proposed plans are not engaged in the business of providing prepaid plans. LegalZoom, as a corporation prohibited by statute from practicing law, should not be engaged in the practice of law. Plaintiff and Defendants are not in competition with each other.

Instead, there is a definition of "prepaid legal service plans" in the North Carolina regulations as well as the Rules of Professional Conduct – approved by the Chief Justice and published by the Supreme Court in its official reporter. (*See* Exhibits 1, 2.) North

Carolina statutes direct the State Bar to regulate the authorized practice of law. Under that statutory authority, the State Bar determined that LegalZoom's proposals did not meet the definition of "prepaid legal services plans" and would constitute the unauthorized practice of law. When LegalZoom challenged that conclusion, the APC agreed with the original analysis and did not register the plans. The allegation that LegalZoom makes here is that the State Bar should not have examined whether LegalZoom's plans were in fact "prepaid legal services plans" or examined whether its plans constitute the unauthorized practice of law. Instead, LegalZoom claims that the State Bar should have rubber stamped its applications and registered its plans.

Once LegalZoom had a final administrative determination from the State Bar, it filed this lawsuit alleging violations of Sections 1 and 2 of the Sherman Act. It did so instead of appealing the State Bar's decision to Superior Court, as it had the right to do.

Whatever LegalZoom's claims might be, they are not viable antitrust claims. There is no allegation (nor could there be) of exclusion of prepaid plans from the North Carolina market and no facts indicating that one competitor sought to exclude another or gain an unfair advantage. The time to recognize that fact is now, with dismissal at the Rule 12 stage of litigation. The State Bar did not act anti-competitively in not registering LegalZoom's plans, but simply found them to be non-compliant with North Carolina law. LegalZoom's Complaint in no way alleges the anticompetitive conduct or the antitrust injury that are required to state a Sherman Act claim. Moreover, the face of the Complaint establishes that LegalZoom's claims are barred by the four-year statute of

2

limitations for Sherman Act claims set forth in 15 U.S.C. 15(b). The State Bar is a state actor entitled to have this action dismissed based on immunity. The individual Defendants are also entitled to dismissal due to immunity or for other reasons.

## STATEMENT OF THE CASE

This latest lawsuit by LegalZoom is one in a series against the State Bar[1] and is a companion case with a 2011 lawsuit pending in the North Carolina Business Court. *See LegalZoom.com, Inc. v. North Carolina State Bar* (No. 11 CVS 15111).[2] Unlike its prior lawsuits, LegalZoom now has also targeted several individuals employed by the State Bar or serving on the State Bar Council. Defendant Ronald L. Gibson, named in his official capacity, is a private-practice attorney and the President of the State Bar. Defendant John N. Fountain, sued in his official and individual capacities, is also in private practice and

---

[1] On 7 November 2011, LegalZoom filed the first of four lawsuits against the State Bar. *LegalZoom.com, Inc. v. North Carolina State Bar*, No. 11 CVS 15111 (N.C. Superior Court; designated as a mandatory complex business case). LegalZoom alleged, among other things, that LegalZoom's online legal document preparation services are not the unauthorized or corporate practice of law and that the State Bar unlawfully declined to register its purported prepaid legal services plans and violated the anti-monopolization provisions of the North Carolina Constitution.

On 19 January 2012 and 11 October 2013, LegalZoom filed its second and third lawsuits against the State Bar, seeking documents under the North Carolina Public Records Law. *See LegalZoom.com, Inc. v. North Carolina State Bar*, No. 12 CVS 00963 (N.C. Superior Court), and *LegalZoom.com, Inc. v. North Carolina State Bar*, No. 13 CVS 13755 (N.C. Superior Court).

[2] Documents in this case are accessible through the Business Court's website, at www.ncbusinesscourt.net/TCDDotNetPublic/default.aspx?CID=3&caseNumber=11CVS 15111. In a Rule 12(b)(6) motion, courts may consider pleadings in another case because they are public records. *See Mann v. Peoples First Nat. Bank & Trust Co.*, 209 F.2d 570, 572 (4th Cir. 1954); *see also Johnson v. BAC Home Loans Servicing, LP*, 867 F. Supp. 2d 766, 772 n.1 (E.D.N.C. 2011); *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 256 n.5 (3d Cir. 2006).

3

serves on the State Bar's APC. The final two Defendants, Joshua T. Walthall and Fern Gunn Simeon, sued in their official and individual capacities, are attorneys working for the State Bar. Simeon previously served as counsel to the APC and Walthall presently occupies that position. There is no suggestion in the Complaint that any individual Defendant took any relevant actions other than in their official capacities. As set forth below, all of these individual Defendants have immunity from this action.

## STATEMENT OF FACTS

The State Bar is an agency of the State created by statute. *See* N.C. Gen. Stat. § 84-15. Subject to oversight by the Chief Justice of the North Carolina Supreme Court, it has the statutory authority to "regulate the professional conduct of licensed lawyers," to "take actions that are necessary to ensure the competence of lawyers," to "formulate … rules of professional ethics and conduct," to "investigate and prosecute matters of professional misconduct," to "formulate and adopt procedures for accomplishing these purposes," and to "do all things necessary in the furtherance of the purposes of this Article that are not otherwise prohibited by law." N.C. Gen. Stat. § 84-23(a).

The State Bar's governing statutes and regulations are found in (a) Chapter 84 of the North Carolina General Statutes, N.C. Gen. Stat. § 84-1, *et seq.*, and most particularly Article 4 thereof, N.C. Gen. Stat. § 84-15, *et seq.*, (b) the North Carolina Rules of Professional Conduct, Chapter 2, Title 27 of the North Carolina Administrative Code, and (c) the State Bar Rules, Chapter 1, Title 27 of the North Carolina Administrative Code, 27 N.C.A.C. 1A.0101, *et seq.*

4

A 62-member council, including three non-lawyers, governs the State Bar.[3]  N.C. Gen. Stat. § 84-17.  The State Bar also has attorneys on staff, including those acting as counsel to various committees.  Of particular relevance here is the APC, a standing committee composed of 29 members.[4]  *See* 27 N.C.A.C. 1A.0701(4), 1D.0206 (powers and duties of the APC), 1D.0207 (powers and duties of counsel to the APC).

The State Bar regulates the authorized practice of law and is charged with preventing its unauthorized practice.  The General Statutes provide that "[t]he [State Bar] Council … may inquire into and investigate any charges or complaints of (i) unauthorized or unlawful practice of law," and "may bring or cause to be brought and maintained in the name of the North Carolina State Bar an action … against any person or entity that engages in rendering any legal service … or makes it a practice or business to render legal services that are unauthorized or prohibited by law."  N.C. Gen. Stat. § 84-37(a).

The State Bar is also charged by statute with overseeing the registration of prepaid legal services plans, *see* N.C. Gen. Stat. § 84-23.1; 27 N.C.A.C. 1E.0301, *et seq.,* which

---

[3] *See* https://www.ncbar.com/public/whatwedo.asp (last accessed 20 October 2015).  On a Rule 12(b)(6) motion, "[a] court may take judicial notice of information publicly announced on a party's web site, so long as the web site's authenticity is not in dispute and 'it is capable of accurate and ready determination.'"  *Jeandron v. Bd. of Regents of Univ. Sys. of Maryland*, 510 F. App'x 223, 227 (4th Cir. 2013) (citing *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007) ("[I]t is not uncommon for courts to take judicial notice of factual information found on the world wide web")); *see also* Fed. R. Evid. 201(b)(2); *Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004) (noting it was proper to consider "publicly available [statistics] on the official redistricting website of the Virginia Division of Legislative Services.").

[4] *See* http://www.ncbar.com/contacts/c_committees.asp (last accessed 20 October 2015).

5

is the focus of LegalZoom's Complaint. The APC "oversee[s] the registration of prepaid legal services plans in accordance with [the State Bar's Rules]." 27 N.C.A.C. 1E.0304(3). As acknowledged by LegalZoom, the State Bar has "readily registered prepaid legal services plans" proposed to it by others. (Compl. ¶ 66.)

A.    The State Bar and Chief Justice's Rulemaking Process

Importantly, all rules and regulations adopted by the State Bar Council "shall be certified to the Chief Justice of the Supreme Court of North Carolina." N.C. Gen. Stat. § 84-21(b). Thus, neither the State Bar Rules nor the Rules of Professional Conduct are established by the State Bar unilaterally. Specifically, Section 84-21 of the North Carolina General Statutes provides "that the court may decline to have so entered upon its minutes any rules, regulations and amendments which in the opinion of the Chief Justice are inconsistent with this Article" (e.g., Article 84 of the North Carolina General Statutes). *Id.* *See also* 27 N.C.A.C. 1A.1403(a)(1) and (b).

Each provision of the State Bar Rules and the Rules of Professional Conduct that Plaintiff challenges in this case was reviewed and approved by the Chief Justice. If the Chief Justice finds a provision to be appropriate and consistent with the General Statutes, he/she officially signs off on the provision, making it an active provision. Further, the Supreme Court as a whole orders the provision to be published in the Supreme Court Reporter. (*See* Exs. 1, 2.) If the Chief Justice does not issue an order of approval, the proposed rule does not go into effect. *See* 27 N.C.A.C. 1A.1403(c) ("No proposed rule or

6

amendment to a rule adopted by the council shall take effect unless and until it is approved by order of the North Carolina Supreme Court.").

> B. LegalZoom's Attempts to Register its Purported Prepaid Plans

LegalZoom has tried to register prepaid plans on two occasions. After the APC expressed concerns about the 2010 application, LegalZoom filed the Business Court case. LegalZoom submitted substantially similar registrations in 2014. The State Bar did not register those plans and LegalZoom filed this action. Both times, the plans were not registered for the same reasons: (i) the plans did not meet the regulatory definition of a "prepaid legal services plan" and (ii) aspects of the plans violated the provisions for the unauthorized practice of law. The definition of prepaid legal services plans is:

> A prepaid legal services plan or a group legal services plan ("a plan") is any arrangement by which a person, firm, or corporation, not otherwise authorized to engage in the practice of law, in exchange for any valuable consideration, offers to provide or arranges the provision of legal services that are paid for in advance of any immediate need for the specified legal service ("covered services"). In addition to covered services, a plan may provide specified legal services at fees that are less than what a non-member of the plan would normally pay. The North Carolina legal services offered by a plan must be provided by a licensed lawyer who is not an employee, director or owner of the plan. A prepaid legal services plan does not include the sale of an identified, limited legal service, such as drafting a will, for a fixed, one-time fee.

N.C.R. Prof. C. 7.3(d)(1); *see also* 27 N.C.A.C. 1E.0303.

> 1. *First registration attempt in 2010*

When LegalZoom first sought to register its purported prepaid plans in July 2010, (Compl. ¶ 61), Gibson was not State Bar President and Walthall was not a State Bar

7

employee. The State Bar did not immediately accept LegalZoom's registration.[5] Rather, there was an exchange of correspondence between LegalZoom and the APC, through its counsel, State Bar employee Simeon. *See LegalZoom.com v. N.C. State Bar*, 2014 NCBC 9, ¶¶ 15-16, 2014 WL 1213242, at *3 (N.C. Super. Ct. Mar. 24, 2014). The APC then met multiple times, but did not register LegalZoom's plans. *Id.* ¶ 17.

LegalZoom did not pursue its alleged Sherman Act claims at that time and did not ask the APC for a hearing and final agency decision. Instead, LegalZoom preempted a final administrative determination by suing in state court in September 2011. *Id.* ¶ 23.

The Business Court ruled on Rule 12 motions, dismissing LegalZoom's equal protection claim (premised on the State Bar's failure to register its plans), because LegalZoom had not exhausted its administrative remedies.[6] *Id.* ¶ 70. (*See also* Compl. ¶ 64.) LegalZoom did not then seek a final determination on the 2010 registration.

2.   *Subsequent registration attempt in 2014*

In September 2014, LegalZoom submitted registration forms for its Business Advantage Pro and Legal Advantage Plus plans. (Compl. ¶ 65.) Pursuant to 27 N.C.A.C. 1E.0305, Walthall who was counsel to the APC by then, reviewed the materials and requested additional information. (*Id.*) On 8 January 2015, Walthall again wrote to

---

[5] For this reason, as set forth below, Plaintiff's Sherman Act claims are time-barred.

[6] Following dismissal of the equal protection and commercial disparagement claims along with the claim that the State Bar acted unlawfully in not registering its plans, *LegalZoom.com*, 2014 NCBC 9, ¶¶ 37-49, 78, 2014 WL 1213242 at *7-9, the key dispute remaining in the Business Court case is whether LegalZoom's online legal document preparation services constitute the unauthorized and/or corporate practice of law.

8

LegalZoom, stating five reasons that the plans did not qualify for registration, including that they did not meet the "prepaid legal services plan" definition and parts of the plans constituted the unauthorized practice of law. (Exhibits 3, 4; Compl. ¶ 65.)

Fountain, a regular member of the APC, chaired the 15 April 2015 LegalZoom hearing, following the recusal of both the Chair and the Vice Chair. (*See* Exhibit 5 (transcript of APC hearing) at 4-5.)[7] After APC counsel Walthall and LegalZoom's counsel presented arguments and evidence, a majority of the APC voted not to register the plans. (Compl. ¶ 69; Ex. 5 at 88-89.) On 17 April 2015, the State Bar Council issued an order denying the registration, the final agency decision, signed by Gibson as President of the State Bar. (Compl. ¶ 15; Exhibit 6.) This lawsuit followed.

## QUESTIONS PRESENTED

1. Whether a viable antitrust claim is presented in the absence of both anti-competitive conduct and antitrust injury?

2. Whether the four-year statute of limitations bars Plaintiff's claims, which accrued more than four years prior to filing?

3. Whether the State Bar, as a state actor, has state action immunity, which bars the claim here?

4. Whether, because Defendants have immunity under the Eleventh Amendment from money damage claims, those claims should be dismissed?

---

[7] The Court may take judicial notice of the hearing transcript because it is a public record. *See McRavion v. Solomon*, No. 5:13-CT-3133, 2014 WL 5810311, *1 n.1 (E.D.N.C. Nov. 7, 2014); *Lowinger v. Johnston*, No. 3:05-CV-316, 2007 WL 2344882, *5 (W.D.N.C. Aug. 16, 2007). The Court may also take judicial notice of the APC hearing transcript because it is integral to and explicitly relied upon in LegalZoom's Complaint. *Alexander v. City of Greensboro*, 762 F. Supp. 2d 764, 821-22 (M.D.N.C. 2011).

5.   Whether claims against the individual defendants, who have qualified immunity, should be dismissed?

6.   Whether the claims against Mr. Fountain, the acting chairperson who presided over LegalZoom's 2014 registration hearing, should be dismissed because he has quasi-judicial immunity?

7.   Whether the claims against the State Bar employees should be dismissed because they have quasi-prosecutorial immunity?

## ARGUMENT

A Rule 12(b)(6) motion should be granted if, assuming the facts in the complaint are true, the facts alleged that would not entitle plaintiff to relief. *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).   To survive a motion to dismiss, a complaint must "set forth facts sufficient to allege each element of [the] claim." *Bass v. E.I DuPont de Nemours & Co*., 324 F.3d 761, 765 (4th Cir. 2003).   "A plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted) (considering the issue in an antitrust case).   "Factual allegations must be enough to raise a right to relief above the speculative level." *Id*.   When the well-pleaded facts permit no more than an inference of the possibility of misconduct, the complaint has not shown "that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations omitted). As to the immunity issues, this motion is also filed pursuant to Rules 12(b)(1) and 12(b)(2).   Under those rules, a motion to dismiss may be supported with Affidavits or other information that is not contained in the Complaint.

10

# I. LEGALZOOM HAS NOT ADEQUATELY ALLEGED ANTITRUST INJURY NOR MONOPOLISTIC BEHAVIOR BY COMPETITORS SUCH THAT ITS SHERMAN ACT CLAIMS FAIL

"To establish a violation of Section 1 of the Sherman Act, [the plaintiff] must prove the following elements: (1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 202 (4th Cir. 2002). This section "applies only to concerted action." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010). "[U]nilateral conduct is excluded from its purview." *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 702 (4th Cir. 1991). If the plaintiff "is able to prove a violation of § 1, it then must prove the existence of '<u>antitrust</u> injury, which is to say injury of the type the anti-trust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Dickson*, 309 F.3d at 202 (emphasis in original) (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)); s*ee also* 15 U.S.C. § 15(a) (providing private cause of action to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws"); *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 449 (6th Cir. 2007) (affirming dismissal for failure to allege antitrust injury because court "must [] reject claims under Rule 12(b)(6) when antitrust standing is missing").

To prevail under Section 2, "a plaintiff must prove that the defendant (1) engaged in predatory or anticompetitive conduct with (2) specific intent to monopolize and with (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). There is a "'basic distinction' in the Sherman Act

11

'between concerted and independent action' that distinguishes § 1 of the Sherman Act from § 2." *Am. Needle*, 560 U.S. at 190 (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767 (1984)). Section 2 "covers both concerted and independent action, but only if that action monopolizes or threatens actual monopolization." *Id.* (internal citations omitted).

A.    LegalZoom Has Failed to Plead (and Has Not Suffered) an Antitrust Injury

As LegalZoom admits in its Complaint, the State Bar has registered a variety of prepaid plans. (*See* Compl. ¶ 66 (alleging that the State Bar has "readily registered prepaid legal services plans" from other providers[8]); *see also id.* ¶¶ 67-68.) In fact, there is a robust market for prepaid plans in North Carolina, with dozens registered by the State Bar.[9] Instead of allegations that show harm to competition, LegalZoom alleges injury only to itself because its plans were not registered.

LegalZoom's allegation of injury to a single market participant fails to allege antitrust injury. *See Atl. Richfield*, 495 U.S. at 334. "The antitrust laws were enacted for the protection of <u>competition</u>, not <u>competitors</u>." *Id.* at 338 (emphases in original) (internal citation omitted). "[A] practice is not 'anticompetitive' simply because it harms

---

[8] The State Bar disagrees with LegalZoom's allegation that the State Bar's reasons for not registering LegalZoom's plans were pretext for "illegal and unreasonable anticompetitive activity." (Compl. ¶ 66.) LegalZoom has alleged no facts to support this speculation, which, in any event, is implausible when other plans are "readily registered."

[9] It is not disputed that the State Bar has registered dozens of plans, and the Court can take judicial notice of this fact. *See* Fed. R. Evid. 201(b); *Jeandron*, 510 F. App'x at 227; *Hall*, 385 F.3d at 424 n.3. A list of the currently-registered prepaid legal services plans is accessible on the State Bar's website. *See* "Prepaid Legal Services Plan," available at www.ncbar.com/programs/prepaid_registered.asp (last accessed 20 August 2015).

12

competitors.... Rather, [it] is 'anticompetitive' only if it harms the competitive process." *Town of Concord, Mass. v. Boston Edison Co.*, 915 F.2d 17, 21 (1st Cir. 1990). *See also Singh v. Mem'l Med. Ctr., Inc.*, 536 F. Supp. 2d 1244, 1250 (D.N.M. 2008) ("[P]erhaps the most basic requirement to successfully state a claim under the Sherman Act, is … that the plaintiff allege that the asserted violation has had an anticompetitive effect; in other words that the defendant's actions have injured competition and not solely the plaintiff.").

Accordingly, "[a] plaintiff cannot prove the unreasonableness of a restraint merely by showing that it caused economic injury." *Continental Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 508 (4th Cir. 2002). Instead, "a plaintiff must show that the net effect of a challenged restraint is harmful to competition." *Id.* Here, LegalZoom does not allege that all providers of prepaid plans have been injured by the alleged anticompetitive actions; it only alleges injury to itself. In fact, it admits that the State Bar has registered prepaid plans from other providers. (Compl. ¶¶ 66-68.) LegalZoom's claims thus fail because it has not alleged harm to the competitive process. *See LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 557 (9th Cir. 2008) ("LiveUniverse's claim necessarily fails" because it "failed to allege anticompetitive conduct and antitrust injury"); *Patel v. Scotland Mem'l Hosp.*, 91 F.3d 132, 1996 WL 383920, at *4 (4th Cir. 1996) (unpublished) (Sherman Act claim dismissed when the complaint did not "demonstrate an impact on the competition as a whole within the relevant market"); *Estate Const. Co. v. Miller & Smith Holding Co.*, 14 F.3d 213, 221-22 (4th Cir. 1994) (dismissing Sherman Act claim under Rule 12(b)(6) because of insufficiency of conspiracy allegations and

13

failure to show how defendant's actions were a restraint of trade); *Microsoft Corp. v. Computer Support Servs. of Carolina, Inc.*, 123 F. Supp. 2d 945, 950 (W.D.N.C. 2000) (granting motion to dismiss when allegations "clearly fail to state a claim under … the Sherman Antitrust Act").  *See also Oksanen*, 945 F.2d at 709 (fact that other doctors entered market during relevant time period weighed against existence of antitrust injury).

Although LegalZoom relies almost exclusively on it, the recent decision in *North Carolina State Board of Dental Examiners v. Federal Trade Commission*, 135 S. Ct. 1101 (2015), does not save its claims from dismissal.  In *Dental Board*, the Supreme Court addressed antitrust claims filed on behalf of non-dentists who wanted to offer teeth whitening services in North Carolina.  The North Carolina Dental Board has authority to oversee the licensure and discipline of dentists and dental hygienists.  *Id.* at 1107.  Eight of the ten members of the Board were licensed dentists who offered teeth-whitening, which non-dentists could perform safely and effectively.  *Id.* at 1108.  After receiving complaints from dentists about price competition from non-dentists, the Board sent cease and desist letters to non-dentists, asserting that teeth whitening services could only be offered by dentists. Effectively, the cease and desist letters foreclosed non-dentists from market participation.  *Id.*  Earlier this year, the Supreme Court found that the Dental Board was not entitled to state action immunity from Sherman Act claims and upheld the FTC's determination that the Dental Board violated antitrust law by sending the cease and desist letters and completely excluding non-dentists from the teeth whitening market.

A key distinction between *Dental Board* and this case is the lack of any allegation

14

of injury to competition. The Fourth Circuit's opinion in *Dental Board* describes the intent and effect of the Dental Board's efforts to exclude non-dentist teeth whitening providers, and their suppliers, from the market:

> [T]he Board issued at least 47 cease-and-desist letters to 29 non-dentist teeth-whitening providers. … These letters effectively caused non-dentists to stop providing teeth-whitening services in North Carolina and also caused manufacturers and distributors of teeth-whitening products used by those non-dentist providers to exit or hold off entering North Carolina. The Board also sent letters to mall operators in an effort to stop malls from leasing kiosk space to non-dentist teeth-whitening providers; additionally, the Board contacted the North Carolina Board of Cosmetic Art Examiners to request that the Cosmetic Board inform its members and licensees to refrain from providing teeth-whitening services. In sum, the Board successfully expelled non-dentist providers from the North Carolina teeth-whitening market.

*N. Carolina St. Bd. of Dental Examiners v. F.T.C.*, 717 F.3d 359, 365 (4th Cir. 2013). *See also Dental Board*, 135 S. Ct. at 1108 ("These actions had the intended result. Nondentists ceased offering teeth whitening services in North Carolina."). Thus, the Dental Board totally excluded the non-dentist teeth whiteners and their suppliers from doing business in North Carolina.

In contrast, LegalZoom's allegations show that the State Bar has not excluded prepaid plan providers from providing such services in North Carolina. The allegation of injury to only itself, while there is otherwise a robust prepaid plan market, is insufficient under both Section 1 and Section 2 of the Sherman Act.[10] Plaintiff has not sufficiently

---

[10] The conduct covered by Section 2 – action that "monopolizes" or "threatens actual monopolization" – is "narrower than restraint of trade," covered by Section 1. *Am. Needle*, 560 U.S. at 190.

alleged anticompetitive activity and a "specific intent to monopolize," much less "a dangerous probability of achieving monopoly power." *Spectrum Sports*, 506 U.S. at 456.

    B.    <u>LegalZoom Failed to Adequately Plead a Conspiracy by Competitors to Exclude it from the Market</u>

To survive a motion to dismiss, a plaintiff must allege facts sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 545. Stated differently, "the complaint's '[f]actual allegations must be enough to … state a claim to relief that is plausible on its face.'" *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d at 903 (emphasis added; quoting *Twombly*, 550 U.S. at 555). Here, for a host of reasons, LegalZoom's factual allegations simply fail to allege a plausible claim for relief.

Defendants and LegalZoom are not competitors. In fact, the State Bar and the individual defendants are not in the business of selling prepaid plans at all. There is no allegation that the State Bar members are seeking to provide <u>prepaid legal services plans</u>, which LegalZoom seeks to provide, or to exclude such plans from the North Carolina market. Instead, the State Bar members provide legal services directly to their employers (e.g., the State of North Carolina in the case of public employees and court officials, non-profit entities, or private companies) or to clients (e.g., in the case of a private practice attorney). And, as acknowledged in LegalZoom's complaint, there are numerous prepaid plan providers in North Carolina, all registered by the State Bar.[11] (Compl. ¶ 66.)

---

[11] A relevant product market includes "commodities reasonably interchangeable by consumers for the same purposes." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956). Since LegalZoom cannot practice law, the only product market that could be relevant is the provision of prepaid plans. LegalZoom seeks to blur the line

There are simply no factual allegations of any actual agreement(s) between the State Bar, Gibson, Walthall, Simeon, or Fountain to exclude prepaid plans in North Carolina. Unlike *Dental Board*, in which the dentists serving on the Board had economic incentives to exclude non-dentist teeth whiteners, the State Bar and its members have no economic reasons to exclude prepaid plans.

Moreover, LegalZoom's monopolization claims make no sense. Given that neither the State Bar nor its members provide prepaid plans, how can they be monopolists in a market in which they are not even market participants? The height of implausibility is claiming that someone is monopolizing a market that they do not serve and as to which they have no incentive to exclude others.

The implausibility of LegalZoom's allegations is reinforced by comparing this case to *Dental Board*. Instead of seeking out LegalZoom to oppose its (and all other providers) prepaid plan efforts as occurred in *Dental Board* (in which the Dental Board "was 'going forth to do battle' with nondentists" after complaints about competition), the State Bar merely responded to LegalZoom's registration applications. (*See* Compl. ¶ 9

---

between the product it wants to offer and the service offered by licensed North Carolina attorneys. LegalZoom thus alleges an unreasonably broad definition of the relevant product market, defining it as "the market for legal services, including delivery through prepaid legal services plans, in North Carolina." (Compl. ¶ 5.) This allegation does not satisfy the requirement that a relevant product market allegation be neither too broad nor too narrow. *See PSKS, Inc. v. Leegin Creative Leather Products, Inc.*, 615 F.3d 412, 418 (5th Cir. 2010) (holding that a product market of "'women's accessories' is too broad and vague a definition to constitute a market"); *Feldman v. Jackson Mem'l Hosp.*, 571 F. Supp. 1000, 1010 (S.D. Fla. 1983), *aff'd*, 752 F.2d 647 (11th Cir. 1985) (claim could not go to the jury because the plaintiff defined the relevant market too broadly by including all surgical services, instead of the only procedure the plaintiff was licensed to perform).

("When LegalZoom submitted its prepaid legal services plans for registration, the Defendants refused to 'accept' them ….").) Moreover, the State Bar applied well-established regulations governing prepaid plans and provided LegalZoom the opportunity to present its case, with state court judicial review, which is in stark contrast to the Dental Board's conduct. *See Dental Board*, 135 S. Ct. at 1108 ("The [Dental] Board's concern did not result in a formal rule or regulation reviewable by the independent Rules Review Commission, even though the Act does not, by its terms, specify that teeth whitening is 'the practice of dentistry.'"); *Oksanen*, 945 F.2d at 706 (challenged conduct that is consistent with legitimate activities weighs against conspiracy inference).

It is important to note that the Supreme Court in both *Twombly* and *Iqbal* dismissed claims as implausible when the alleged unlawful conduct was consistent with lawful behavior. In *Iqbal,* the complaint alleged that, after the September 11th terrorist attacks, the Attorney General and the FBI Director approved the arrest and detention of thousands of Arab Muslim men in highly restrictive conditions. *Iqbal*, 556 U.S. at 666. Assuming that to be true, the Supreme Court held that the plaintiff failed to state a claim because his allegations did not plausibly establish his theory of discriminatory purpose given more likely explanations related to terrorism and security. *Id*. at 682-83. *See also Twombly*, 550 U.S. at 566 (court would not infer unlawful conspiracy from defendants' parallel conduct that was consistent with lawful, unilateral conduct). Here, the State Bar and its members have no economic incentive to exclude prepaid plans, took no affirmative action to do so, followed a well-established regulatory scheme, and have

18

approved dozens of compliant plans. The more likely explanation is that the State Bar was acting lawfully, which compels dismissal of LegalZoom's claims.

In addition to being implausible, the Complaint lacks allegations sufficient to show the concerted action required to state a Section 1 claim. A plaintiff must allege non-conclusory facts showing the existence of an agreement – facts that "tend to rule out the possibility that the defendants were acting independently." *Twombly*, 550 U.S. at 554; *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 321 (3d Cir. 2010).

Here, Plaintiff has only made formulaic allegations of conspiracy and concerted action. (*See* Compl. ¶¶ 20-22, 71.) There are no specific factual allegations on the nature or circumstances of the alleged unlawful agreement. The conclusory allegations are insufficient to state any claim. *See Twombly*, 550 U.S. at 555. Instead, the allegations establish only that Walthall and Simeon took actions consistent with their job duties as State Bar employees, (Compl. ¶¶ 61, 65, 68), that Fountain presided over and voted on an APC matter, (*id.* ¶ 18), and that Gibson as State Bar President signed an "order … denying registration of LegalZoom's prepaid legal services plans," (*id.* ¶ 15). This, at the most, is an example of non-actionable parallelism combined with a bare assertion of a conspiracy. Under *Twombly*, Plaintiff's claims should be dismissed.

## II. LEGALZOOM'S CLAIMS ARE BARRED BY THE SHERMAN ACT'S STATUTE OF LIMITATIONS.

LegalZoom first sought to register plans in 2010 but did not file this action until 2015 and its claims are barred by the statute of limitations. The limitations period under the Sherman Act is "four years after the cause of action accrued." 15 U.S.C. § 15b.

19

"Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971). Acting pursuant to its rules, the State Bar did not ministerially register LegalZoom's plans in 2010, and LegalZoom brought an action in state court. Finding that LegalZoom failed to exhaust its administrative remedies, the Business Court dismissed that claim. Thereafter, LegalZoom again sought to register prepaid plans in 2014. Again, acting pursuant to its rules, the State Bar did not ministerially register LegalZoom's plans and this lawsuit followed.

Plaintiff alleges that the State Bar violated the Sherman Act by promulgating and enforcing a "prepaid legal services plan" definition and procedures for registration of such plans, even though the Chief Justice approved those rules. It contends that its plans should have been immediately registered by the State Bar, because "[t]he only statutory power remaining in the hands of the State Bar is to take the ministerial step of registering legal services plans on forms it provides." (Compl. ¶ 49 (emphasis in original).) According to LegalZoom, the State Bar has no "power to approve legal services plans prior to sale," and no "power to determine whether plans are 'proper' under North Carolina law. (*Id.*) Its entire challenge is to the application of any procedures other than the "ministerial" step of stamping "accepted" onto a registration form upon receipt.

The State Bar applied these challenged procedures in July 2010. In other words, the State Bar acted in a non-ministerial manner as of that time. In fact, LegalZoom alleges that "from July 2010 onward, Defendants jointly and severally decided to refuse

20

to register LegalZoom's prepaid legal services plans ...." (Compl. ¶ 61 (emphasis added).) Accordingly, Plaintiff has admitted that its claim accrued in July 2010. In 2014, the State Bar received registration materials from LegalZoom, and again it applied its registration procedures and the definition of "prepaid legal services plans." In essence, LegalZoom repeated the same act and the State Bar responded in the same way.

"Exclusion from a market is a conventional form of antitrust injury that gives rise to a claim for damages as soon as the exclusion occurs ... even though, in the nature of things, the victim's losses lie mostly in the future." *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 271 (7th Cir. 1984). Plaintiff's claim thus accrued in 2010, when the State Bar allegedly excluded LegalZoom from the prepaid plan market by acting in a non-ministerial manner with respect to its attempted registration. (*See* Compl. ¶ 61.) The injury alleged was final at the moment the State Bar acted in a non-ministerial manner. Because LegalZoom did not file this lawsuit until July 2015 – five years after the State Bar applied its rules instead of acting ministerially – its claims are time-barred under the four-year statute of limitations. *See* 15 U.S.C. § 15b; *Pocahontas Supreme Coal Co., Inc. v. Bethlehem Steel Corp.*, 828 F.2d 211, 217-18 (4th Cir. 1987) (claim brought more than four years after termination of contract was time-barred); *N. Carolina Elec. Membership Corp. v. Carolina Power & Light Co.*, 780 F. Supp. 322, 332 (M.D.N.C. 1991) ("Plaintiffs' cause of action accrued when they first suffered injury and damage" and any overt acts that occurred prior to the limitations period were barred).

Under Plaintiff's allegations and theory, although details differ somewhat between the two registration attempts, the events in 2014 were not different in character from those in 2010. LegalZoom should not be allowed to file what is, for all practical purposes, an identical registration in September 2014 simply to create another touchpoint for antitrust damages. *See Garelick v. Goerlich's Inc.*, 323 F.2d 854, 855-56 (6th Cir. 1963) (suit initiated five years after defendant ceased doing business with plaintiffs was barred by the four-year statute of limitations because the antitrust claims accrued when the defendant terminated relationship, not when it later refused to reinstate plaintiff); *Martinez v. W. Ohio Health Care Corp.*, 872 F. Supp. 469 (S.D. Ohio 1994). The Complaint should therefore be dismissed in its entirety, with prejudice.

III. **AS A STATE ACTOR, THE STATE BAR IS IMMUNE FROM ANTITRUST ACTION.**

States have an important role to regulate activities affecting their citizens and within their borders. The Supreme Court consistently recognizes that role, including in *Dental Board* when it stated that "[t]he States … when acting in their respective realm, need not adhere in all contexts to a model of unfettered competition." *Dental Board*, 135 S. Ct. at 1109. Instead, "in some spheres [States] impose restrictions on occupations, confer exclusive or shared rights to dominate a market, or otherwise limit competition to achieve public objectives." *Id.* (internal citation omitted). If state law or policy was "required to conform to the mandates of the Sherman Act, thus promoting competition at the expense of other values a State may deem fundamental, federal antitrust law would impose an impermissible burden on the States' power to regulate." *Id.*

22

Thus, when a State acts in a sovereign capacity, it is immune from antitrust liability even when the application has an anticompetitive effect. Even if there was a sufficient anticompetitive injury alleged here, which is not the case, the State Bar, as a state actor, is immune from this action. That is true whether the State Bar is viewed as an arm of the state, as a quintessential state agency, or as a nonsovereign actor controlled by market participants but supervised by a qualified state actor.

A.    The State Bar is a State Actor and Immune from Antitrust Actions

The North Carolina State legislature enacted the provisions of Chapter 84, which charge the State Bar with regulating the authorized practice of law. To make rules and regulations, the State Bar submits them to the Chief Justice, who determines whether they are consistent with Chapter 84 and then either signs to enact them or refuses to sign, thus rejecting them. The North Carolina Supreme Court authorizes the publication of those rules and regulations in the North Carolina Reports, its official publication. The State Bar then operates according to the statutes and regulations put into place by the General Assembly and by the Supreme Court. As stated by the United States Supreme Court, "[s]tate legislation and 'decisions of a state supreme court, acting legislatively rather than judicially,' will satisfy this standard [an exercise of the State's sovereign power], and 'ipso facto are exempt from the operation of the antitrust laws' because they are an undoubted exercise of state sovereign authority." *Dental Board*, 135 S. Ct. at 1110 (quoting *Hoover v. Ronwin*, 466 U.S. 558, 567-68 (1984)).

The *Hoover* decision, cited in *Dental Board*, compared two prior cases involving

23

state bar decisions – one holding that state action immunity applied (*Bates*) and another (*Goldfarb)* in which it did not apply. *See Hoover*, 466 U.S. at 568. The difference was the involvement of each state's supreme court in the rule-making process.

In *Bates*, the issue involved Arizona's attorney advertising regulation. Rejecting the plaintiffs' Sherman Act claim, the Supreme Court found that state action immunity applied because the Arizona Supreme Court had approved the measures in question. *Bates v. State Bar of Arizona*, 433 U.S. 350, 359-60 (1977). The state supreme court was "the ultimate body wielding the State's power over the practice of law." *Id.* at 360. The Court cited Article 3 of the Arizona Constitution, which provides that:

> The powers of the government of the state of Arizona shall be divided into three separate departments, the legislative, the executive, and the judicial; and, except as provided in this constitution, such departments shall be separate and distinct, and no one of such departments shall exercise the powers properly belonging to either of the others.

Ariz. Const., Art. 3. The Court held that "the challenged restraint is the affirmative command of the Arizona Supreme Court under its [court rules] and its [disciplinary rules]," and "is compelled by direction of the State acting as a sovereign." *Bates*, 433 U.S. at 359-60 (internal citation omitted). Because of the state supreme court's approval, the regulation "reflect[ed] a clear articulation of the State's policy with regard to professional behavior." *Id.* at 362. In other words, the *Bates* Court "held that a state supreme court, when acting in a legislative capacity, occupies the same position as that of a state legislature." *Hoover*, 466 U.S. at 568. Accordingly, the state bar's application of the regulation did not violate the Sherman Act. *Bates*, 433 U.S. at 363. *See also Lawline*

24

*v. Am. Bar Ass'n*, 956 F.2d 1378, 1384 (7th Cir. 1992) ("Here the Illinois Supreme Court was acting in a legislative capacity and therefore in the same position as a state legislature, so that the activities in question are exempt from Sherman Act liability.").

By contrast, in *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 789 and n.19 (1975), the Virginia Supreme Court had not specifically approved the challenged regulation, a fee schedule. Instead, the state bar could only argue that the challenged regulation was "prompted," by ethical codes adopted by the state supreme court. *Id.* at 791. Accordingly, the state bar's actions to enforce the county bar's fee schedule, which "resulted in a rigid price floor" for consumers, were not entitled to state action immunity. *Id.* at 791-92. *See also California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 104 (1980) ("In [*Goldfarb*], the Court concluded that fee schedules enforced by a state bar association were not mandated by ethical standards established by the State Supreme Court. The fee schedules therefore were not immune from antitrust attack.").

As in *Bates*, and in contrast to *Goldfarb*, in this case, the "state supreme court, acting legislatively," through the Chief Justice, has compelled the State Bar to enforce, and attorneys and prepaid plan providers to follow, the relevant State Bar Rules and Rules of Professional Conduct. This includes the definition of "prepaid legal services plans" in 27 N.C.A.C. 1E.0303 and Rule of Professional Conduct 7.3(d). Further, the North Carolina Constitution has an analogous provision to the Arizona provision that was meaningful in *Bates*: "The legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other." N.C. Const.

25

Art. I, § 6.  Furthermore, "[t]he General Assembly shall have no power to deprive the judicial department of any power or jurisdiction that rightfully pertains to it as a co-ordinate department of the government."  N.C. Const. Art. IV, § 1.

In *Dental Board*, the United States Supreme Court affirmed the applicability of an "*ipso facto*" exemption from the antitrust laws due to state action immunity, which applies under the circumstances here.  *Dental Board*, 135 S. Ct. at 1110.  Even if there was a sufficient antitrust injury alleged, which the State Bar denies, Plaintiff's complaint should still be dismissed.

B.     The State Bar is a Quintessential State Agency so Plaintiff's Claims Fail

The Fourth Circuit examined the nature of state agencies and acknowledged that "more quintessential state agencies" may not need to show active supervision to be entitled to immunity under the state action doctrine.  *See Dental Board*, 717 F.3d at 367 n.4.  Although admittedly the question of what qualifies as a "quintessential state agency" is not yet further developed, the State Bar in the present context and acting in the present capacity must fall into that category.

The regulation of law-related services is an area in which "the State may decide that 'forms of competition usual in the business world may be demoralizing to the ethical standards of a profession,'" without facing the prospect of a Sherman Act claim.  *Goldfarb*, 421 U.S. at 792 (internal citation omitted).  "The interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been 'officers of the

courts.'" *Id. See also Application of Griffiths*, 413 U.S. 717, 729 (1973) ("Lawyers do indeed occupy professional positions of responsibility and influence that impose on them duties correlative with their vital right of access to the courts. Moreover, by virtue of their professional aptitudes and natural interests, lawyers have been leaders in government throughout the history of our country.")

The Fourth Circuit noted that "the Supreme Court has cautioned that we should be hesitant to quickly condemn the actions of professional organizations because 'certain practices by members of a learned profession might survive scrutiny … even though they would be viewed as a violation of the Sherman Act in another context.'" *Dental Board*, 717 F.3d at 375 (quoting *Nat'l Society of Prof'l Eng'rs v. U.S.*, 435 U.S. 679, 686 (1978)). "That is, '[t]he public service aspect' of a profession 'may require that a particular practice … be treated differently.'" *Id.* (quoting *Goldfarb*, 421 U.S. at 788 n.17). The Supreme Court has held that "[i]t is … important both to society and the bar itself that lawyers be unintimidated – free to think, speak, and act as members of an Independent Bar." *Konigsberg v. State Bar of Cal.*, 353 U.S. 252, 273 (1957).

Against this backdrop, the State Bar serves as an important actor in the State of North Carolina's government. The State Bar was "created as an agency of the State of North Carolina," N.C. Gen. Stat. § 84-15, and is "vested, as an agency of the State, with the authority to regulate the professional conduct of licensed lawyers," among other things, N.C. Gen. Stat. § 84-23(a). Its members are the attorneys authorized to practice law in the courts of this State, and an attorney cannot practice in this State without being

27

a member of the State Bar.  N.C. Gen. Stat. §§ 84-4 ("[I]t shall be unlawful for any person or association of persons, except active members of the Bar of the State of North Carolina admitted and licensed to practice as attorneys-at-law, to appear as attorney or counsel at law in any action or proceeding before any judicial body" or engage in other similar actions); § 84-16 (including similar language).

In turn, the concept of authorization to practice law in the State's courts – e.g., membership in the State Bar – is itself of constitutional dimension.  In three places, the North Carolina Constitution specifically references this concept, which is inseparable from the existence of the State Bar itself under North Carolina law.  *See* N.C. Const. Art. III, § 7(7) ("Only persons <u>duly authorized to practice law</u> in the courts of the State shall be eligible for appointment or election as Attorney General.") (emphasis added); Art. IV, § 18(1) (same, for District Attorneys); Art. IV, § 22 (same, for Supreme Court justices, Court of Appeals judges, and trial court judges).

Given these provisions, the State Bar must fall into the category of "quintessential state agency" if any state agency is capable of doing so.  As such, this is yet another reason that the State Bar is immune from this action, even if the Court were to find that antitrust injury is adequately alleged.

C.      At a Minimum, the State Bar is Immune under the *Parker* Doctrine

As set forth above, the Supreme Court recognizes that States are entitled to significant deference to establish their own policies through legislation and regulation.  Thus, "the Court in *Parker v. Brown* [317 U.S. 341, 350-51 (1943)] interpreted the

antitrust laws to confer immunity on anticompetitive conduct by the States when acting in their sovereign capacity." *Dental Board*, 135 S. Ct. at 1110. *Parker* "recognized Congress' purpose to respect the federal balance and to 'embody in the Sherman Act the federalism principle that the States possess a significant measure of sovereignty under our Constitution.'" *Id.* (quoting *Community Communications Co. v. Boulder*, 455 U.S. 40, 53 (1982)). *Parker* immunity is also known as "state-action antitrust immunity."

In addition to providing immunity to state actors, *Parker* provides immunity in the context of "a nonsovereign actor controlled by active market participants" when the allegedly anticompetitive conduct is actively supervised by the State. *Id.* To any extent the Court were to conclude that the State Bar is not a state actor or a quintessential state agency, but rather is a nonsovereign actor controlled by active market participants, it is entitled to *Parker* immunity.

The *Parker* line of cases recognize that deference is necessary for a nonsovereign actor that is applying state regulation or legislation in a manner that is deemed to have an anticompetitive effect and is doing so under active supervision. The two requirements for immunity are "first that the challenged restraint…be one clearly articulated and affirmatively expressed as state policy, and second that the policy…be actively supervised by the State." *Id.* (quoting *FTC v. Phoebe Putney Health System, Inc.*, 133 S. Ct. 1003, 1010 (2013)).

> 1. *The State Bar, with the supervision of the Chief Justice, meets the Parker test*

The State Bar is given authority over registering prepaid legal services plans by

29

N.C. Gen. Stat. § 84-23.1. It provides, among other things, that "[a]ll organizations offering prepaid legal services plans shall register those plans with the North Carolina State Bar Council on forms provided by the Council," and that "[e]ach plan shall be registered prior to its implementation or operation in this State and shall renew its registration with the State Bar annually."[12] N.C. Gen. Stat. § 84-23.1(b1). The statute specifies that "[t]his section is in addition to and not a limitation of the powers and responsibilities of the council set out in G.S. 84-23," and "[t]o the extent that this section deals with the same powers and responsibilities it shall be taken to be in amplification of those powers and not in derogation thereof." N.C. Gen. Stat. § 84-23.1(a).

The gist of Plaintiff's Complaint is that the State Bar exceeded its authority and engaged in anticompetitive conduct when it promulgated the rules regarding registration of prepaid plans – including most importantly the definition of a "prepaid legal services plan" – and then enforced the rules. (*See* Compl. ¶¶ 46-60, 66 ("These restrictions are not authorized by the Legislature and the State Bar lacks legislative authority to deny registration on that basis."); 67-68.) LegalZoom does not allege that its plans actually complied with the Chief Justice-approved regulations, or that is plans should have been registered under the regulations in effect at the time of registration. In other words, LegalZoom does not allege that the rules were misapplied. The appropriate place for

---

[12] The existence of a statute specifically addressing prepaid plans is an important distinction between this case and *Dental Board*. There, "[b]y statute, North Carolina delegates control over the practice of dentistry to the [Dental] Board." *Dental Board*, 135 S.Ct. at 1116. "The [Dental Practice] Act, however, says nothing about teeth whitening, a practice that did not exist when it was passed." *Id.*

30

legal scrutiny therefore should be on the adoption of the rules in question – whether the adoption of the rules was consistent with a clearly articulated state policy and whether the adoption process was actively supervised. That is because LegalZoom argues that the rules themselves are *ultra vires*, and therefore any application of those rules, whether or not it was actively supervised, would be improper. Focusing on the acts of promulgation, they are exercises of the State's sovereign powers as a matter of law, and *Parker* applies to immunize the alleged acts from the federal antitrust laws.

The State Bar's proposed rules and regulations must be submitted to, and approved by, the State's highest judicial officer, who is subject to state-wide election. *See* N.C. Gen. Stat. 84-21(b). It is the Chief Justice, not the State Bar itself, who makes the final call on whether proposed rules and regulations "are inconsistent with this Article." *Id.* The Chief Justice specifically signs off on each proposed rule or regulation that he or she approves. (Ex. 1.) Further, the entire Supreme Court publishes those materials in the official reporter of the North Carolina Supreme Court. (Ex. 2.) When the Chief Justice does not believe that the proposed rule or regulation passes muster, that item will not go into effect. *See* 27 N.C.A.C. 1A.1403(c).

The State Bar, with the Chief Justice's supervision and approval, has defined "prepaid legal services plans" in the State Bar Rules and in the Rules of Professional Conduct. *See* 27 N.C.A.C. 1E.0303; N.C.R. Prof. C. 7.3(d)(1). The definition is identical in each source. There are additional provisions, approved in the same manner, that address how prepaid plan registrations are handled procedurally, *see* 27 N.C.A.C.

31

1E.0301, *et seq.*, and establish conditions for attorney participation in such programs, *see* N.C.R. Prof. C. 7.3(d)(2). These rules and regulations, and the definition of a prepaid plan, were appropriately developed by the State Bar under its authority in N.C. Gen. Stat. § 84-23(a) to "formulate rules of professional ethics and conduct," to "formulate and adopt procedures for accomplishing these purposes," and to "do all things necessary in the furtherance of the purposes of this Article that are not otherwise prohibited by law." Nothing in N.C. Gen. Stat. § 84-23.1 limits this authority – in fact, it explicitly is "in addition to" and "in amplification of those powers." N.C. Gen. Stat. § 23.1(a).[13]

LegalZoom argues that, despite the statutory and regulatory language, "[r]ules adopted by the State Bar are not approved by the Supreme Court," and that "[t]he only review is limited and passive." (Compl. ¶ 57 n.4.) This allegation asks this Court to assume, without any supporting factual allegations, that the Chief Justice does not carry out his or her duties in good faith and with diligence – that the Chief Justice of the North Carolina Supreme Court is just a rubber stamp. The comity that federal courts show to state supreme courts – and common sense – do not support such a groundless and insulting inference about the Chief Justice's conduct of his or her duties. *See, e.g. Younger v. Harris*, 401 U.S. 37, 44 (1971) ("[T]he notion of 'comity,' that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a

---

[13] This statutory language, combined with the fact that the General Assembly did not define "prepaid legal services plans" in the statute, obviously indicates that the legislature left it to the State Bar and Chief Justice to define the term and implement other appropriate regulations. The Chief Justice obviously agreed, by approving the rules.

Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways."). It also stands in contrast to the specific statement that the Chief Justice personally signs, attesting that each rule or regulation is found to be "not inconsistent" with the controlling provisions in Chapter 84 of the North Carolina General Statutes. (Ex. 1.)

Furthermore, this active supervision of the State Bar by the Chief Justice differs materially from the Dental Board. Under N.C. Gen. Stat. § 90-28(a), "[t]he North Carolina Board of Dental Examiners shall have the power to make necessary bylaws and regulations, not inconsistent with the provisions of this article, regarding any matter referred to in this Article and for the purpose of facilitating the transaction of business by the Board." There is no provision under this statute, which authorizes the Dental Board to promulgate regulations, that requires approval by an elected State official such as the Chief Justice of the North Carolina Supreme Court.[14]

The State Bar rule-making process is a "procedure[] that suffice[s] to make it [the State Bar's rulemaking process on this issue] the State's own." *Dental Board*, 135 S. Ct. 1111. By the same token, the result of this process is a "clearly articulated State policy" regarding the registration requirements for a prepaid legal services plan. *Parker*

---

[14] In fact, in the amicus brief that LegalZoom filed in the *Dental Board* case, it identified "numerous state officials who, unlike state bar associations, do not have a direct financial interest in suppressing perceived competition," including "[j]udges." *See Amicus Brief of LegalZoom.com, Inc.*, filed 6 August 2014 in *North Carolina State Board of Dental Examiners v. FTC* (U.S. Supreme Ct., No. 13-534), at 24.

33

immunity therefore applies, even if the conduct at issue could be found to be anticompetitive (which the State Bar disputes for the other reasons discussed herein).

        2.     *The Attorney General's participation is an additional indicia of active supervision*

The North Carolina Attorney General has been involved from the beginning in the State Bar's defense against LegalZoom's antitrust claims (including defending against LegalZoom's claim under the North Carolina Constitution's Monopoly Clause in the ongoing Business Court case for several years), which is an important additional element of active State supervision in this case. As a result, the elected Attorney General has fully defended the actions of the State Bar and the individual Defendants. This kind of active supervision was absent with respect to the Dental Board. *See Dental Board*, 717 F.3d at 375 ("not[ing] that the [Dental] Board is represented by private counsel and the State has never intervened in these proceedings on the [Dental] Board's behalf"); *see also Maryland Stadium Auth. v. Ellerbe Beckett, Inc.*, 407 F.3d 255, 264-65 (4th Cir. 2005) (finding that representation in litigation by the Attorney General was a factor in showing State control); *Cash v. Granville Cnty. Bd. of Educ.*, 242 F.3d 219, 225 (4th Cir. 2001) (representation by private counsel instead of Attorney General in case indicated absence of state control). Active supervision by a disinterested state official ensures and confirms Defendants' compliance with state policy. The Fourth Circuit suggested, and it is demonstrated here, that active State supervision of this kind also entitles a state agency to *Parker* immunity. The Supreme Court did not explicitly address this issue – but it implicitly agreed with the Fourth Circuit, holding that "the inquiry regarding active

34

supervision is flexible and context-dependent," and that it "need not entail day-to-day involvement in an agency's operation or micromanagement of its every decision." *Dental Board*, 135 S. Ct. at 1116.

## IV.    THE ELEVENTH AMENDMENT BARS CLAIMS FOR MONEY DAMAGES.

Plaintiff's claim for money damages against the State Bar and the individual Defendants is barred by the Eleventh Amendment to the United States Constitution, which provides immunity to the states from suits by citizens that are brought in federal court. *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54-59 (1996); *Martin v. Wood*, 772 F.3d 192, 195 (4th Cir. 2014); *Schopler v. Bliss*, 903 F.2d 1373, 1379 (11th Cir. 1990) (Eleventh Amendment barred antitrust claim against state agency); *Zapata Gulf Marine Corp. v. Puerto Rico Mar. Shipping Auth.*, 682 F. Supp. 1345, 1352, 1355 (E.D. La. 1988) (same).   The state does not need to be named as a defendant to be considered the real party in interest. *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997) (Eleventh Amendment encompasses "not only actions in which a State is actually named as the defendant, but also certain actions against state agents and state instrumentalities").   It also applies to state agencies like the State Bar that exercise state power.   "A particular state entity may be entitled to immunity...if, in its operations, the state is the real party in interest." *Ram Ditta By & Through Ram Ditta v. Maryland Nat. Capital Park & Planning Comm'n*, 822 F.2d 456, 457 (4th Cir. 1987); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977) (immunity extends to state agencies that are characterized as "arm[s] of the State").

35

A.    The State Bar Has Eleventh Amendment Immunity

The Fourth Circuit looks to multiple factors to determine whether a claim for money damages against a state agency is barred by Eleventh Amendment immunity. *See Cash*, 242 F.3d at 224. The overarching question is whether the agency more closely resembles a state (or its instrumentalities) or a municipality like a city or county. *Id.* at 222. The first factor is "whether a judgment against the government entity would have to be paid from the State's treasury." *Id.* at 223. Beyond who is responsible for paying any judgment, courts look at: (1) "the degree of control that the State exercises over the entity or the degree of autonomy from the State that the entity enjoys;" (2) "the scope of the entity's concerns – whether local or statewide – with which the entity is involved;" and (3) "the manner in which State law treats the entity." *Id.* at 224. The factors focus on whether "the judgment would adversely affect the dignity of the State as a sovereign and as one of the United States." *Id.*

Applying these factors, the State Bar is entitled to Eleventh Amendment immunity. As a state agency, any judgment against the State Bar would be paid by the North Carolina treasury, subject to there being appropriate authorization for the expenditure. *See* N.C. Gen. Stat. § 147-68; *Smith v. State*, 289 N.C. 303, 319-21, 222 S.E.2d 412, 423-24 (1976) (judgment against State of North Carolina cannot be satisfied unless General Assembly appropriates funds). Were the State Bar unable to fund its operations because of a judgment – including preventing the unauthorized practice of law, investigating and prosecuting matters of professional misconduct, suspending and

36

reinstating attorneys, monitoring the use of client trust funds, and overseeing continuing legal education, among many other duties – there would be substantial harm to the public, to the profession, and to the operation of the court system. *See, e.g.*, N.C. Gen. Stat. § 84-23. Any such shortfall would obviously have to be covered to maintain the State's interest in the State Bar's important regulatory functions that have been mandated by the General Assembly and the Supreme Court.[15] *See Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014) (noting that the question is the state treasury's functional liability, not necessarily its legal liability). Were LegalZoom to attempt to execute on a judgment, it would find that the State Bar's headquarters sits on land owned by the State. (*See* Exhibit 7 (Memorandum of Lease between the State of North Carolina and the North Carolina State Bar, "an agency of Lessor")). Furthermore, the State Bar's defense in this case is being funded, in part, by the North Carolina Attorney General, with counsel from that office appearing on the State Bar's behalf. These factors all demonstrate the State of North Carolina's functional liability for an antitrust judgment entered against the State Bar.

Moreover, a judgment against the State Bar would adversely affect the dignity of the State. First, North Carolina exercises control over the State Bar. The State Bar's authority and mandate are established by statute. All rules and regulations promulgated by the State Bar must be approved by the Chief Justice before they are effective, as

---

[15] The State Bar could not simply raise the fees it charges to members, which are capped at $300 by statute. *See* N.C. Gen. Stat. §§ 84-34, 84-34.2.

discussed above. By statute, "the approval of the Governor and the Council of State" is required for the State Bar to engage in real estate transactions and other financial transactions. N.C. Gen. Stat. 84-23(d). *See also Hutto*, 773 F.3d at 546-47. The State Bar is represented here and in other litigation, including the pending Business Court case, by the Attorney General. *Id.* at 546. Second, the State Bar has statewide concerns and jurisdiction. *Id.* at 547-48. It regulates the practice of law, proposes rules and regulations for the Chief Justice's approval, and investigates matters of professional conduct, from Murphy to Manteo. *See* N.C. Gen. Stat. § 84-23. Third, North Carolina law treats the State Bar as a state entity. *See Hutto*, 773 F.3d at 548. The State Bar was "created as an agency of the State of North Carolina." N.C. Gen. Stat. § 84-15. It "is vested, as an agency of the State, with the authority to regulate the professional conduct of licensed lawyers." N.C. Gen. Stat. § 84-23(a). *See also, e.g.*, *In re Reinstatement of McGee*, 217 N.C. App. 325, 327-28, 719 S.E.2d 222, 224 (2011); *LegalZoom*, 2014 NCBC 9, ¶ 40, 2014 WL 1213242, at *8; *N.C. State Bar v. Lienguard, Inc.*, 2014 NCBC 11, ¶¶ 86-87, 2014 WL 1365418, at *15 (N.C. Super. Ct. Apr. 4, 2014).

Even LegalZoom has alleged in its three other lawsuits that the State Bar "is an instrumentality and agency of the State of North Carolina." (Exhibit 8 (excerpts from LegalZoom's complaints).) LegalZoom should now be estopped from contending otherwise. *See, e.g.*, *Folio v. City of Clarksburg*, 134 F.3d 1211, 1217 (4th Cir. 1998). The Business Court accepted LegalZoom's allegation when it held that the State Bar is "an agency … in the executive branch of the government of this State" under the State's

38

APA.  *LegalZoom*, 2014 NCBC 9, ¶ 40, 2014 WL 1213242, at *8 (quoting N.C. Gen. Stat. § 150B-2(1a)).  This holding is especially significant to the Eleventh Amendment analysis because "agency" as defined in the APA is limited to "unit[s] of government in the executive branch," and excludes "[a] local unit of government."  N.C. Gen. Stat. § 150B-2(1a).  This answers the question of whether the State Bar "is more like a county or city than it is an arm of the State."  *Cash*, 242 F.3d at 222 (internal citation omitted).

Furthermore, the State Bar has been found to have Eleventh Amendment immunity.  *See Myers v. North Carolina*, No. 5:12-CV-714, 2013 WL 4456848, at *4 (E.D.N.C. Aug. 16, 2013).  Other courts have similarly found that damages suits against state bars should be dismissed under the Eleventh Amendment.  *See Mirch v. Beesely*, 316 F. App'x 643 (9th Cir. 2009) (barring Sherman Act claims); *Lawrence v. Chabot*, 182 F. App'x 442, 450 (6th Cir. 2006); *Kaimowitz v. Florida Bar*, 996 F.2d 1151, 1155 (11th Cir. 1993) ("The Eleventh Amendment prohibits actions against state courts and state bars.") (per curiam); *Krempp v. Dobbs*, 775 F.2d 1319, 1321 (5th Cir. 1985); *Ginter v. State Bar of Nevada*, 625 F.2d 829, 830 (9th Cir. 1980) (per curiam); *Hunter v. Virginia State Bar*, 786 F. Supp. 2d 1107, 1111 (E.D. Va. 2011).

B.    The Individual Defendants Sued in Their Official Capacities Have Eleventh Amendment Immunity

The Eleventh Amendment also precludes damages suits brought against state officers for official conduct.  *See Martin*, 772 F.3d at 195; *Gray v. Laws*, 51 F.3d 426, 430 (4th Cir. 1995).  *See also Coggeshall v. Mass. Bd. of Registration of Psychologists*, 604 F.3d 658, 662 (1st Cir. 2010) (dismissing claims against members of the

39

Massachusetts Board of Registration of Psychologists). Courts have held that officers and employees of the State Bar are entitled to dismissals based on sovereign immunity. For example, in *Myers*, the court found that claims against individual State Bar defendants should be dismissed because "the North Carolina State Bar is an agency of the state of North Carolina" and thus, "the State Bar defendants are state officials and enjoy immunity for their actions taken in an official capacity." *Myers*, 2013 WL 4456848, at *4. *Cf. Sutton v. N. Carolina State Bar*, No. 5:14-CV-243, 2014 WL 4546017, at *6 (E.D.N.C. Sept. 12, 2014) (holding that the State Bar's status as a state agency immunizes its employees and officers from Section 1983 claims). Plaintiff's official-capacity claims against the individual Defendants as employees and officers of an "agency and instrumentality" of the State should be dismissed.

      C.    <u>The Individual Defendants Sued in Their Individual Capacities Have Eleventh Amendment Immunity</u>

Eleventh Amendment immunity also applies to Plaintiff's individual-capacity claims because, "in reality, [LegalZoom] is suing [Fountain, Walthall, and Simeon] for actions taken by them in their official capacities on behalf of" the State Bar. *Martin*, 772 F.3d at 195. To allow the claims to proceed simply because LegalZoom labeled them as individual-capacity claims "would be to adhere to an empty formalism and to undermine the principle … that Eleventh Amendment immunity represents a real limitation on a federal court's federal-question jurisdiction." *Id.* (quoting *Idaho v. Couer d'Alene Tribe of Idaho*, 521 U.S. 261, 270 (1997)). Applying the factors in *Martin*, the State is the real party in interest here, including because all of the allegations against the individuals

involve acts taken in the course and scope of their official duties under the State Bar Rules. These actions were "tied inextricably to their official duties." *Id.* at 196 (internal citation omitted). There are no allegations of actions taken outside of their official duties. Accordingly, "the mere incantation of the term 'individual capacity' is not enough to transform an official capacity action into an individual capacity action" that could avoid application of the Eleventh Amendment. *Id.* at 195 (internal citation omitted).

## V. THE INDIVIDUAL DEFENDANTS HAVE QUALIFIED IMMUNITY FROM PLAINTIFF'S CLAIMS

LegalZoom's claims against the individual Defendants should be dismissed under the doctrine of qualified immunity.[16] Qualified immunity is a question of law for the Court. *Tapley v. Collins*, 211 F.3d 1210, 1215 (11th Cir. 2000). By asserting qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Government officials performing a discretionary function are immune from liability for civil damages unless (i) the officers' conduct violates a federal statutory or constitutional right; (ii) the right was clearly established at the time of the conduct; and (iii) an objectively reasonable officer would have understood that the conduct violated that right." *Trulock v. Freeh*,

---

[16] "Qualified immunity may be raised in a motion to dismiss." *Jenkins v. Medford*, 119 F.3d 1156, 1159 (4th Cir. 1997). It is important to "resolv[e] immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

41

275 F.3d 391, 399 (4th Cir. 2001). Qualified immunity thus protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The individual Defendants here fall into neither category and are protected by qualified immunity. *See Howe v. Bank for Int'l Settlements*, 194 F. Supp. 2d 6, 21-22 (D. Mass. 2002) (holding that qualified immunity barred Sherman Act claims).

Each individual Defendant may claim qualified immunity for acts within the scope of their discretionary authority – in other words, for acts "pursuant to their job functions and within the scope of their authority." *In re Allen*, 106 F.3d 582, 594 (4th Cir. 1997) (quoting *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994)). Plaintiff's allegations demonstrate that the individual Defendants squarely fall into this category. Gibson, in his role as President of the State Bar, is alleged to have signed an "order...denying registration of LegalZoom's prepaid legal services plans." (Compl. ¶ 15.) Fountain, in his role as a member and acting chair of the APC during the hearing on registration of Plaintiff's plans, is alleged to have voted on that matter when presented to the APC. (*Id.* ¶ 18.) Simeon, prior counsel to the APC, and Walthall, present counsel to the APC, are alleged to have taken actions consistent with their job duties as employees of the State Bar. (*Id.* ¶¶ 61, 65, 68.) Plaintiff's allegations demonstrate that the individual Defendants were acting within the bounds of their jobs or roles with the State Bar.

In performing their functions, the individual Defendants are entitled to qualified immunity unless they violated a federal right or statute that was clearly established and an objectively reasonable person would have known of the violation. As an initial matter,

42

on a Rule 12(b)(6) motion, Defendants are entitled to dismissal due to qualified immunity when the complaint fails to show violation of the plaintiff's rights. *Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("If no … right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."). As noted in Section I of this brief, Plaintiff has not adequately alleged a plausible violation of Section 1 or Section 2 of the Sherman Act. For this reason alone, the individual Defendants are entitled to qualified immunity.

Additionally, even if this Court ultimately concluded that a right was violated, there is no way that these Defendants could have known that they were violating that right at the time of the conduct by doing what the Chief Justice approved. To seek to establish the right, LegalZoom relies almost exclusively on *Dental Board*, a decision that did not exist during the 2010 registration attempt and that the Supreme Court had not decided as of the 2014 registration attempt. Moreover, as set forth herein, *Dental Board* is entirely distinguishable from the facts in this matter and thus would not have provided sufficient notice even if it had been in existence. For example, nothing in either *Dental Board* opinion would put Defendants' on notice that they could not comply with the State Bar Rules and Rules of Professional Conduct. Nor would either opinion put Defendants on notice that the failure to register a single registrant's plans, while "readily register[ing]" others, could violate the Sherman Act. Further, as a state actor, the State Bar and its volunteers and employees would have believed then (as they believe now) that state action immunity would apply to their actions. Therefore, the individual

43

Defendants could not have reasonably known in 2010, 2014, or 2015 that their actions could be construed to violate Sections 1 and 2 of the Sherman Act. Plaintiff's claims should be dismissed under the doctrine of qualified immunity.

## VI. DEFENDANT FOUNTAIN HAS ABSOLUTE QUASI-JUDICIAL IMMUNITY FROM PLAINTIFF'S CLAIMS

As stated above, Fountain is a lawyer in private practice who acted as the chairperson during the APC hearing on LegalZoom's registration. In that capacity, he acted in a quasi-judicial role and thus has immunity.

Judicial immunity applies to government officials performing functions analogous to those of a judge in administrative or agency proceedings. *Butz v. Economou*, 438 U.S. 478, 508, 515 (1978); *Ostrzenski v. Seigel*, 177 F.3d 245, 249-50 (4th Cir. 1999); *Sutton*, 2014 WL 4546017, at *6 (State Bar counsel immune); *Moity v. La. State Bar Ass'n*, 414 F. Supp. 180, 183 n.17 (E.D. La.), *aff'd*, 537 F.2d 1141 (5th Cir. 1976) (state bar association entitled to quasi-judicial immunity when passing upon applications for admission to the bar).

Whether a quasi-judicial officer qualifies for immunity depends on "the functional comparability of [the officer's] judgments to those of a judge." *Butz*, 438 U.S. at 512. (internal citation omitted). The inquiry "depends not on the title of the officer, but on whether the alleged conduct which gives rise to the complaint involved the performance of a … quasi-judicial function." *Howard v. Food Lion, Inc.*, 232 F. Supp. 2d 585, 594 (M.D.N.C. 2002) (quoting *Pippin v. Scales*, 822 F. Supp. 305, 309 (M.D.N.C. 1993)). The three "main criteria" are: "(1) whether the official's functions are similar to those of

44

a judge; (2) whether a strong need exists for the official to perform essential functions for the public good without fear of harassment and intimidation; and (3) whether adequate procedural safeguards exist to protect against constitutional deprivations." *Id.* at 595. The Court has held that "[t]hese principles apply … to state officials performing quasi-judicial duties." *Id.* The application of this test to the instant facts demonstrates that Fountain is entitled to quasi-judicial immunity. As acting chairperson of the APC during its 15 April 2015 hearing, (Compl. ¶ 18), Fountain presided much like a judge, including having the authority to convene the hearing, to issue subpoenas, and to administer oaths to witnesses.[17] 27 N.C.A.C. 1D.0205(a)(6)-(8) (2015). The State Bar's Rules explicitly contemplate an adversarial, evidentiary hearing in this setting, much like the types of hearings over which judges preside. 27 N.C.A.C. 1E.0305, IE.0313 (2015).

Those Rules provide rules for the conduct of the hearing, which the chairperson must enforce. They provide that there must be a record of the proceeding and that the rules of evidence apply. Much like a court trial, the allegedly aggrieved party may appear and be heard, including through counsel, and may offer witnesses and evidence in the manner of a trial. 27 N.C.A.C. 1E.0313 (2015). The APC's counsel may also appear to present the State Bar's position and offer witnesses and evidence. There are rules allocating the burden of proof (LegalZoom's in this instance) and what happens depending on whether that burden is met. *Id.* If the State Bar Council accepts the APC's

---

[17] There is no allegation that Fountain took any actions with respect to LegalZoom's 2010 registration effort.

45

recommendation as its final agency action, 27 N.C.A.C. 1E.0314 (2015), the plan sponsor may challenge that decision by filing a petition for judicial review with the Superior Court, with appeal to the North Carolina Court of Appeals. *See* N.C. Gen. Stat. §§ 7A-27, 150B-43, 150B-45, 150B-49 to 52.

In *Howard*, the Court held that an appeals referee for the State Employment Security Commission was entitled to quasi-judicial immunity because: (i) he performs "adjudicative functions;" (ii) a strong need exists to insulate appeals referees from harassment and intimidation by frustrated parties; and (iii) he operated within a web of procedural safeguards, including the right to seek judicial review of a final agency decision. *Howard*, 232 F. Supp. 2d at 595-96. Applying these same factors here under the applicable rules it is clear that Fountain is entitled to quasi-judicial immunity. First, as acting chairperson he was responsible for ensuring that the hearing was conducted in accordance with all applicable law and rules. Second, it is beyond doubt that a "strong need exists for [the APC chairperson] to perform essential functions for the public good, without fear of harassment or intimidation." *Id.* at 595. If officials in Fountain's position knew that their service on quasi-judicial bodies like the APC could result in a personal claim against them for millions of dollars, (Compl. ¶ 11), by a frustrated, angry or vengeful registrant, most would probably refuse to serve. This would frustrate the very purpose of Chapter 84 of the General Statutes. Third, adequate safeguards are built into the APC's procedures to ensure that registrants are not deprived of their legal rights. In

46

these circumstances, Fountain is entitled to quasi-judicial immunity, and LegalZoom's claims against him should be dismissed with prejudice.

## VII. DEFENDANTS WALTHALL AND SIMEON HAVE ABSOLUTE QUASI-PROSECUTORIAL IMMUNITY FROM PLAINTIFF'S CLAIMS

Prosecutors are also entitled to absolute immunity with regard to their actions within the jurisdiction of their office. *See, e.g.*, *Imbler v. Pachtman*, 424 U.S. 409, 422-29 (1976). This absolute immunity is not grounded in any desire to "shield abuses of office, but because any lesser degree of immunity could impair the judicial process itself." *Kalina v. Fletcher*, 522 U.S. 118, 127 (1997) (quoting *Malley*, 475 U.S. at 342). As the Fourth Circuit has observed, misconduct by lawyers playing the role of prosecutors is subject to criminal and professional sanctions, which "obviate the need for damages actions to prevent unjust results." *Dababnah v. Keller-Burnside*, 208 F.3d 467, 471 (4th Cir. 2000) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 522-23 (1985)).

This immunity also applies to government officials performing functions analogous to those of a prosecutor in administrative or agency proceedings. *Butz*, 438 U.S. at 508, 515; *Ostrzenski*, 177 F.3d at 249-50; *Fares v. U.S. Immigration and Naturalization Serv.*, 29 F. Supp. 2d 259, 262-63 (W.D.N.C. 1998). Quasi-prosecutorial immunity is necessary to protect officials from efforts by frustrated parties to intimidate, harass, or retaliate against them for conducting agency action. *Butz*, 438 U.S. at 515-16.

Courts have repeatedly recognized that state bar staff lawyers who represent state bar committees in the context of state bar hearings are absolutely immune from suit for money damages under the doctrine of quasi-prosecutorial immunity. *See, e.g.*, *Sutton*,

47

2014 WL 4546017, at *7; *Myers*, 2013 WL 4456848, at *4 (holding that Simeon and other State Bar staff attorneys had quasi-prosecutorial immunity); *Hunter*, 786 F. Supp. 2d at 1112 (assistant counsel for the Virginia State Bar absolutely immune under the doctrine of quasi-prosecutorial immunity with respect to claim that state bar disciplinary action violated the plaintiff's constitutional rights); *see also Ginger v. Circuit Court for the Cnty. of Wayne*, 372 F.2d 621, 625 (6th Cir. 1967).

A.    Defendant Walthall Has Quasi-Prosecutorial Immunity in Connection With the 2014 Registration Attempt

Walthall is entitled to absolute quasi-prosecutorial immunity from LegalZoom's claims.  As discussed in the preceding section of this brief, the APC's hearings regarding prepaid plan registrations are quasi-judicial in nature.  Beginning with an amendment in October 2010, the State Bar Rules have provided that "[c]ounsel will review the plan's initial registration statement to determine whether the registration statement is complete and the plan, as described in the registration statement, meets the definition of a prepaid legal services plan and otherwise satisfies the requirements for registration provided by Rule .0304."  27 N.C.A.C. 1E.0305 (2011).  Counsel can then direct the issuance of a certificate of registration, or "will inform the plan's sponsor that the registration is not accepted and explain any deficiencies," subject to resubmission of an amended registration form or a request for a hearing before the APC.  *Id.*

This action by the APC's counsel in making an initial determination whether a proposed prepaid plan meets the applicable legal requirements is analogous to a prosecutor's action in making an initial determination whether to submit a matter to a

48

grand jury for its consideration and action. The conduct of the APC's counsel during APC hearings concerning the proposed registration of a plan is also analogous to the conduct of a prosecutor, inasmuch as 27 N.C.A.C. 1E.0313 (2015) explicitly contemplates that counsel for the APC shall appear at APC hearings on behalf of the State Bar, and that such counsel may offer witnesses, documents, and arguments on behalf of the State Bar in the proceeding. Furthermore, if APC counsel were to engage in any misconduct in the course of his or her duties, he or she would be subject to possible criminal prosecution (in the case of corruption, for example) or to professional sanctions. *Dababnah*, 208 F.3d at 471. LegalZoom was also protected by the procedural safeguards in the State Bar's Rules relating to plan registrations and APC hearings, including the right to seek judicial review, which LegalZoom chose to forego in favor of this action. In these circumstances, Walthall is entitled to quasi-prosecutorial immunity and LegalZoom's claims for money damages against him should be dismissed with prejudice.

B.  Claims Against Defendant Simeon in Connection With the 2010 Registration Attempt Should Also be Dismissed

Simeon is also entitled to absolute quasi-prosecutorial immunity. When Plaintiff first attempted to register its purported prepaid plans with the State Bar in July 2010, (Comp. ¶¶ 61-62), Simeon was counsel to the APC. LegalZoom's complaint alleges that Simeon acted similarly to Walthall with respect to LegalZoom's 2010 registration attempt. (Compl. ¶¶ 61-63.) Accordingly, she is entitled to the same quasi-prosecutorial as Walthall for the reasons set forth.

49

Simeon is entitled to dismissal for another reason. The correspondence she sent to LegalZoom in 2010 shows that she was operating under the prior version of the regulation, which was in effect when LegalZoom initiated its July 2010 registration. (*See* Exhibit 9.)[18] At that time the regulation did not provide for APC counsel to make an initial determination whether the plan should be registered. *See* 27 N.C.A.C. 1E.0305 (2010). Instead, the controlling regulation provided that the APC was itself to make the determination "whether the plan meets the definition of a prepaid legal services plan." *Id.* This refutes Plaintiff's allegation that Simeon "refused to register LegalZoom's plans…." (Compl. ¶ 62.) She did not decide whether or not to register LegalZoom's plans. Therefore, she could not have imposed an unreasonable restraint on trade, for purposes of a Section 1 claim, or engaged in predatory or anticompetitive conduct, for purposes of a Section 2 claim. Accordingly, to any extent that Simeon is not entitled to quasi-prosecutorial immunity, the claim against her should nonetheless be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss Plaintiff's Complaint, with prejudice.

---

[18] The Court can take judicial notice of documents that are integral to and explicitly relied upon in the complaint, like Simeon's letters. *See Alexander*, 762 F. Supp. 2d at 821-22.

This the 20th day of August, 2015.

/s/ Alan W. Duncan
Alan W. Duncan
N.C. State Bar No. 8736
Allison Van Laningham Mullins
N.C. State Bar No. 23430
Stephen M. Russell, Jr.
N.C. State Bar No. 35552

MULLINS DUNCAN HARRELL
    & RUSSELL PLLC
300 N. Greene St., Suite 2000
Greensboro, NC 27401
Telephone: 336-645-3320
Facsimile: 336-645-3330
aduncan@mullinsduncan.com
amullins@mullinsduncan.com
srussell@mullinsduncan.com


Roy Cooper, Attorney General of the State
of North Carolina

By: /s/ I. Faison Hicks
    I. Faison Hicks
    Special Deputy Attorney General
    N.C. State Bar No. 10672

NORTH CAROLINA DEPT. OF JUSTICE
Special Litigation Section
114 W. Edenton St.
Raleigh, NC 27603
Telephone: 919-716-6629
Facsimile: 919-716-6763
fhicks@ncdoj.gov

*Counsel for Defendants*

51

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system, which will provide notification of filing to counsel of record.

This the 20th day of August, 2015.

/s/ Alan W. Duncan
Alan W. Duncan